IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ALBERT KING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:12-CV-190-WKW |
| | ) | [WO] |
| OFFICER REGINALD | ) | |
| ANDERSON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court are two motions for summary judgment: one filed by Defendants Reginald Anderson, Marian Ford Williams, Jasmine Scarver, and Henry Postell (collectively "the Officers") (Docs. # 96, 97, 98); and another filed by Dr. Jerry N. Gurley (Docs. # 99, 100).  Plaintiff Albert King opposes the motions.  (Docs. # 101, 102.)  Defendants have filed reply briefs.  (Docs. # 104, 105.)  Upon consideration of the arguments, the evidence, and the relevant law, the court finds that Defendants' motions for summary judgment are due to be granted.[1]

## I. JURISDICTION AND VENUE

The court has subject matter jurisdiction over this case based upon 28 U.S.C. §§ 1331 and 1343.  Personal jurisdiction and venue are uncontested.

---

[1] All citations to page numbers in the record are to page numbers generated by CM/ECF, unless otherwise indicated.

## II.  STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id.*; Fed. R. Civ. P. 56(c)(1)(A).  Or, the movant can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B).  If the movant meets its burden, the burden shifts to the nonmoving party to establish – with evidence beyond the pleadings – that a genuine dispute material to each of its claims for relief exists.  *Celotex*, 477 U.S. at 324.  A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor.  *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## III.  BACKGROUND

**A.**   <u>Facts</u>

This suit arises from events that took place while Mr. King was a detainee at the Montgomery County Correctional Facility ("MCCF") in Montgomery, Alabama.  Counts I and II of the Amended Complaint relate to an attack by two inmates on Mr. King.  Count III relates to the medical care that Mr. King received for injuries sustained during the attack.  The facts are divided accordingly between the details relating to the attack and the details relating to Mr. King's care.

### 1.   *Details of Attack*

While he was incarcerated at MCCF, Mr. King and other inmates watched TV in their dorm area of Cellblock 4-B.[2]  Changing the TV channel was customarily a task for officers, but Defendants deny that there was a written policy that only officers could control the TV.  (*See* Doc. # 102-11 at ¶ 21.)  Because the TV is out of arm's reach, officers used the end of a broom handle to change the channel.  On the morning of Saturday, September 17, 2011, Officer Anderson allowed an inmate to keep the broom for that purpose.[3]

---

[2] The MCCF Inmate Handbook provides that television is a privilege.  In addition to watching television at night, "[c]ellblocks with good behavior may receive additional television privileges for the weekend."  (Doc. # 102, at  Section 3.I.)

[3] Officer Postell saw Officer Anderson leave the broom in the inmates' custody.  Officer Scarver is also alleged to have seen the broom under the control of inmates, but she testifies that she believed all cleaning supplies had been retrieved from the inmates.

For two hours or so, the inmates handled the entrustment of the broom with dignity, but around 11:00 a.m., an inmate, Rico Gibson, abused the privilege. Mr. King, who is apparently not an Auburn football fan, asked Mr. Gibson about looking for a different football game. Mr. Gibson, who was in possession of the broom, became upset and started calling Mr. King names. Officer Anderson was monitoring the situation from a control booth where he was on duty. He did not leave the booth to mediate the conflict, but he did pound on the window to try to encourage the inmates to stop. Eventually, Mr. King walked away from the verbal confrontation, but as he departed, Mr. Gibson attacked him with the broom handle. Another inmate also jumped in, beating Mr. King with his fists. According to Mr. King, Officers Anderson, Postell, and Scarver watched and failed to intervene. Their alleged deliberate indifference to Mr. King's safety during the attack was captured on video.

When Mr. Gibson attacked Mr. King, Officer Anderson used the intercom to order the inmates to lock down in their cells, but the inmates did not obey. Officer Anderson called the MCCF Central Control to report the fight and announced a "Code Blue" on his hand held radio. Code Blue indicates an inmate-on-inmate fight, and all available officers must report to the scene to help restore order. Officer Anderson remained in the control booth because it is MCCF protocol for

the duty-officer not to leave the control booth until another officer can take his place.

Officer Scarver, who was roving the fourth floor and distributing juice to inmates in Cellblock 4-A, heard the commotion in 4-B, reported to the area, and witnessed Mr. Gibson hitting Mr. King with the broom.  (*See* Doc. # 102-10 (Incident Report).)  She also called a "Code Blue" on her radio and waited for other officers to assist.  Three officers arrived a little over one minute after Officer Anderson's alert, and they, along with Officer Scarver, entered the cell block to stop the fight.  (Doc. # 98, at 4.)  According to the Officers, the video of the incident shows that the fight began at 10:54:24, Officer Anderson called for backup four seconds later, and the four officers entered the cell block at 10:55:47. (Doc. # 98, at 4.)[4]  During his deposition, Mr. King stated that he believed he was attacked for "at least three or four minutes."  (Doc. # 97-1, at 14 (King Dep., at 49).)[5]

---

[4] Officer Postell was on visitation duty elsewhere in the jail and not anywhere nearby when the fight broke out.  He relieved Officer Anderson of his control booth duties during a break prior to the inmates' fight.  At that time, he observed the inmates using the broom to reach the TV.

[5] Prior to counsel's appearance for Mr. King, Defendants produced a disc to the court with the video surveillance of Cellblock 4-B on Saturday, September 17, 2011.  (*See* Doc. # 71, Ex. B.)  The court has not had success in viewing the video which apparently must be opened and viewed with a program not installed on the court's computers.  Mr. King says he also has furnished a video which shows the Officers' deliberate indifference to the attack.  (*See* Doc. #102-5 ("Exhibit E: Montgomery County Detention Facility video of the incident will be filed with the Court via hand delivery.").)  Mr. King has not provided the video to the Clerk of the Court, even after being reminded by telephone.

Mr. King claims that the Officers appreciated the substantial threat of danger that came with entrusting the broom to the inmates.  He accuses Officers Anderson, Postell, and Scarver of failing to enforce MCCF anti-weapons policies and failing to take steps to prevent the harm that he has endured.  He cites the MCCF Inmate Handbook's directive that "[w]hen staff enters a cell block for the purpose of [various tasks, including] to change television channels, etc., and you are not locked down, the officer will order you to refrain from talking and to fall-in behind the red line located behind the dayroom tables."  (Doc. # 102-1, at Section 1.E.1.)  This is a policy governing the conduct of inmates – not officers – when officers enter cellblocks to change a TV channel or perform other services for inmates.  Mr. King also references MCCF's predictable policy against inmate possession of weapons and contraband, as well as a "Memorandum of Record" from Officer Ford Williams to Officer Anderson, after the incident at issue in this litigation, wherein she accounts that she "instructed Officer Anderson" and others "that at no time are the inmates to use the broom for any unintended purposes." (Doc. # 102-13.)

The Officers emphasize that inmates were allowed to clean their cells each day with brooms, mops, brushes, and cleaning chemicals.  An officer brought the supplies to the cellblock and left them with the inmates for several hours before

collecting them.   This occurred routinely while Mr. King was incarcerated at MCCF.

## 2.   *Details of Medical Care*

After Mr. King was attacked, Officer Ford Williams took pictures of Mr. King's injuries.  Mr. King's head, face, back, and left hand were swollen, and he claims that his hand was "obviously broken."   (Compl. at ¶ 44.)   Mr. King requested hospital care, but Officer Ford Williams refused, telling him it was not within her authority to decide if he required hospital care.  Nurses with MCCF's medical provider, Quality Correctional Health Care ("QCHC"), evaluated Mr. King at 11:15 a.m.  Their notes say that they cleaned, measured, and dressed Mr. King's wounds, recorded his vital signs, checked his vision, and that Mr. King "denied any pain upon departure."  (Doc. # 97-1, at 76.)  Mr. King denies that his wounds were bandaged or that he told the nurses he was not in pain.  Mr. King was placed in a cell in the medical unit for observation.  The doctor on call, Dr. Bates, was informed about Mr. King, but Dr. Bates did not examine him.  Nurses gave Mr. King Motrin and ice for pain and swelling.   Their records for Sunday, September 18, 2011 indicate that Mr. King reported no pain.

On Monday, September 19, 2011, Mr. King was seen by QCHC's employee, Dr. Gurley.  Dr. Gurley observed scratches on Mr. King's forehead and two black eyes.   He performed a neurological examination.   According to Mr. King, Dr.

Gurley examined Mr. King's hand after Mr. King showed it to him.  (Doc. # 97-6, at 19 (King Dep. at 71).)  Dr. Gurley observed that the hand was swollen, but did not diagnose a fracture and returned Mr. King to the inmate population.  Mr. King claims that he filled out several sick call requests about pain in his hand that went ignored.[6]  Dr. Gurley says that Mr. King was seen by nurses on September 21, 23, and 24 when Mr. King complained of other issues like double vision and headaches.  (Doc. #101-2, at 3 (Gurley Aff.).)

A week later on September 26, 2011, Dr. Gurley saw Mr. King a second time.  At that point, Dr. Gurley acknowledged that Mr. King may have experienced a boxer's fracture to his hand and ordered x-rays.  Otherwise, Dr. Gurley offered no medical treatment because he believed Mr. King was malingering about injuries to his head and sight and that Mr. King just wanted prescription drugs.  According to Dr. Gurley, September 26, 2011 was the first time that Mr. King "complained of pain to his hand."  (Doc. # 87, at ¶ 54 (Answer to Am. Compl.); *see also* Doc. # 101-2. at 3 (Gurley Aff.) ("This was the first time the hand had been mentioned to anyone.").)  The x-ray, which was taken on September 27 and interpreted on October 2, revealed a fractured left fifth metacarpal.  (*See* Doc. # 101-2, at 3 (Gurley Aff.).)

---

[6] These reported sick calls are not in the medical records.  During Mr. King's deposition, counsel for Dr. Gurley inquired about why the medical records prior to September 26, 2011, did not indicate Mr. King's complaint about his hand.  Mr. King suggests that medical staff lied on their records and that his written sick calls went missing.  (Doc. # 97-1, at 35 (King Dep. at 134–135).)

On October 5, 2011, Mr. King received outside treatment from Dr. Tucker Mattox at Southern Orthopedic Surgeons, LLC.  Dr. Mattox noted the age of the injury, that Mr. King was not being medicated for the injury, that he had prominence of the left fifth metacarpal, and that Mr. King still experienced soreness in his hand.  Dr. Mattox decided to splint the finger and to let it heal.  He noted that he could not perform open reduction and internal fixation ("ORIF") surgery because Mr. King's hand had begun to heal already.[7]  By that time, it had been eighteen days since Mr. King was injured, eleven days since Dr. Gurley had ordered an x-ray, and three days since the x-ray had been interpreted as revealing a fracture.

Dr. Gurley examined Mr. King on October 10, 2011, for Mr. King's complaints of headaches and blurred vision.[8]  Dr. Gurley again believed that Mr. King was malingering and drug seeking, but ordered an ophthalmology appointment and more Motrin.  Mr. King was transported to Institute for Total Eye Care ("ITEC") on October 17, 2011, where he was seen by Dr. Charles Robbins.

---

[7] An ORIF is a two-step surgical procedure for repairing bone fractures that would not heal correctly with casting or splinting alone.  First, the bone is put back into place; second, an internal fixation device is placed on the bone, such as screws, plates, rods, or pins.

[8] Prior to sustaining injuries in the September 19, 2011 fight, Mr. King had complained of chronic and sinus headaches on at least three occasions.  Dr. Gurley reports that he examined Mr. King, prescribed medication, and ordered a sinus x-ray.  Another physician interpreted the x-ray and concluded that it showed no problems or sinusitis.  (Doc. # 100, at 7.)

Dr. Robbins noted Mr. King's complaints of double or blurred vision but reassured Mr. King that he did not believe that any treatment was necessary.

When Mr. King saw Dr. Mattox again on October 26, 2011, three weeks after his first appointment, Dr. Mattox noted that Mr. King's range of motion was improving but that he did not have full flexion and still had prominence consistent with a fracture. Dr. Mattox noted that Mr. King was not wearing the splint he had furnished. In spite of Mr. King's abandonment of the splint, Dr. Mattox believed that the fifth metacarpal bone was properly positioned and that the fracture was healing well.

Three months after sustaining his injuries, Mr. King was examined for his head injuries. He complained of pain in his back, head, and eye, and of blurry and double vision. Mr. King was taken to Jackson Hospital on January 3, 2012, where he received a CT scan.

Defendants represent that from September 17, 2011, until March 22, 2012, medical staff at MCCF saw Mr. King at least 33 times, and Dr. Gurley saw him 7 times. He was also examined by a psychiatrist, an ophthalmologist, and an orthopedic surgeon, and he received several x-rays and a CT scan. Defendants contend that these actions show that there was no deliberate indifference to Mr. King's medical needs. In his complaint, Mr. King asserts that he should have received professional hospital care after he was attacked, and that an orthopedic

specialist should have been consulted much sooner so that his hand could have healed properly.  He claims that he continues to suffer from pain and diminished mobility in his hand because the fractured bone did not heal properly.  He argues that a lay person can observe that the finger is "not attached properly" and is larger than the same finger on his opposite hand.  (Doc. # 101, at 16.)[9]  Yet Mr. King acknowledges that he has not seen a doctor since he was released from MCCF. (Doc. # 97-1 (King Dep. at 125).)

## B.  **Procedural History**

Mr. King filed this suit *pro se* on February 29, 2012.  About a year later, after Mr. King made several amendments to his complaint, counsel appeared on Mr. King's behalf and filed the Amended Complaint (Doc. # 81), which is the operative pleading.  In Count I, Mr. King alleges that Officers Anderson, Postell, and Scarver were deliberately indifferent to a substantial risk of harm in violation of the Eighth and Fourteenth Amendments.  In Count II, Mr. King claims that the

---

[9] Although Mr. King cites non-specifically to his entire deposition (Doc. #97-6) in support of his assertion that his hand is visibly deformed, the court cannot find any testimony describing his hand, at present, in the deposition transcript or other record evidence.  He also cites generally to his Exhibits C and D which are several pages of medical records from Baptist Health and Dr. Mattox's Practice, respectively.  Even after perusing these exhibits, there appears to be nothing in them to substantiate his claim that his hand did not heal or that it is deformed.

Mr. King's counsel is reminded of Section 2 of the court's Uniform Scheduling Order ("USO"), which is the same in every civil case.  The USO provides that parties should cite the evidence "by a specific reference, by page and line, to where the evidence can be found in a supporting deposition or document.  Failure to make such specific reference will result in the evidence not being considered."  (Doc. # 91, at 1.)  In this instance, out of caution, the evidence was considered notwithstanding Mr. King's non-compliance with the USO, but the evidence was found lacking.

same Defendants failed to protect him in violation of the Eighth and Fourteenth Amendments.   In Count III, Mr. King alleges that all Defendants acted with deliberate indifference to his serious medical needs, in violation of the Eighth and Fourteenth Amendments.   Each of the Officers is sued in his or her individual and official capacities under 42 U.S.C. § 1983.

## IV.  DISCUSSION

**A.**   <u>**Narrowing the Issues**</u>

**1.**   ***Claims Against Officer Ford Williams***

In his response to Dr. Gurley's motion for summary judgment, Mr. King asserts that he is arguing that Count III applies only to Dr. Gurley, and Counts I and II apply to the Officers.  (Doc. # 101, at 1 n.1.)  In his Amended Complaint, Mr. King implicates Officer Ford Williams only with respect to his medical-needs claim (Count III).  (*See* Am. Compl. at ¶¶ 14, 43, 45, 93, 96, 101, 113, 114, 115.) Thus, the Officers assert that the sole claim against Officer Ford Williams has been abandoned.  (Doc. # 105, at 2.)  At one point in his brief, Mr. King groups Officer Ford Williams with Officers Anderson, Scarver, and Postell as being responsible for entrusting the broom to the inmates.  (Doc. # 102, at 13.)  But Mr. King may not amend his claim through summary judgment opposition briefing. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314–15 (11th Cir. 2004.  Mr. King

has conceded any claim against the Officers for deliberate indifference to serious medical needs, and Officer Ford Williams is due to be dismissed from the case.

**2.   *Eighth Amendment versus Fourteenth Amendment***

Mr. King asserts in his brief that he was a convicted inmate at the time of the alleged constitutional violations, and thus, his claims arise under the Eighth Amendment's prohibition against cruel and unusual punishment, applied to the States by the Fourteenth Amendment.  The Officers and Dr. Gurley assert that Mr. King was a pretrial detainee, and therefore, the claims arise under the Fourteenth Amendment's guarantee of due process.  (*See* Doc. # 33-1 (Aff. Wanda J. Robinson dated Apr. 4, 2012, at ¶ 3) ("Albert King, Jr. was booked in . . . on June 24, 2011, and charged with [various crimes] . . . .  Inmate King is a pre-trial detainee and remains in the detention facility.").)

Regardless of whether Mr. King's claims arise under the Eighth Amendment or the Fourteenth Amendment, the same legal standards apply to each of Mr. King's deliberate indifference claims.  *See Bozeman v. Orum*, 422 F.3d 1265, 1272 n.13 (11th Cir. 2005) ("The standard for providing basic human needs to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments.") (quotation marks, alteration, and citation omitted); *see also Goodman v. Kimbrough*, 718 F.3d 1325, 1331 n.1 (11th Cir. 2013) (reaching the same conclusion in context of deliberate indifference to known, substantial risks of

serious harm to inmates' safety).  Although the court's analysis would be more concise and direct if it was clear that Mr. King was or was not a pretrial detainee, the court will analyze the deliberate indifference claims without reference to the Eighth or Fourteenth Amendments.

### 3. *Official Capacity Claims*

The Officers contend that any suit against them in their official capacities for monetary damages is due to be dismissed because they are entitled to Eleventh Amendment immunity.  (Doc. # 98, at 9.)  Dr. Gurley adopts and incorporates the Officers' immunity arguments as his own.  ("Doc. # 100, at 12.)  Mr. King opposes Defendants' assertion of Eleventh Amendment immunity on his claims for monetary damages.  (*See* Docs. # 101, at 8; 102, at 9).  Mr. King offers legal authority in support of his opposition only with respect to Dr. Gurley.  (Doc. # 101, at 16–18.)

A state is entitled to sovereign immunity and may not be sued unless it consents to suit or unless Congress abrogates sovereign immunity.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–99 (1984).  Suits brought pursuant to 42 U.S.C. § 1983 are no exception to the rule.  *Quern v. Jordan*, 440 U.S. 332, 342 (1979).  Thus, Alabama officials are immune from claims brought against them in their official capacities for monetary damages because the State is the real party in interest.  *Lancaster v. Monroe Cnty., Ala.*, 116 F.3d 1419, 1429

(11th Cir. 1997). Alabama sheriffs and their deputies act as state officials when they fulfill their roles of supervising inmates and operating county jails. *See Turquitt v. Jefferson Cnty., Ala.*, 137 F.3d 1285, 1289 (11th Cir. 1998). Consequently, the Officers are entitled to Eleventh Amendment immunity on Mr. King's claims against them in their official capacities for monetary damages.

Accordingly, the official-capacity claims against the Officers are due to be dismissed on sovereign immunity grounds. The Officers' entitlement to qualified immunity on individual-capacity claims is addressed *infra*.

However, because Dr. Gurley is not a state official, he is not entitled to sovereign immunity. Moreover, the Amended Complaint does not allege any official-capacity claim against Dr. Gurley. (*See* Am. Compl. at ¶ 8.)

### 4.   *Request for Declaratory Relief*

The Officers contend that Mr. King's claims for declaratory relief against them in their official capacities are also barred by the Eleventh Amendment. The Officers assert that because Mr. King is no longer an inmate, he may not seek injunctive relief for past violations of federal law. They contend that "[u]nder these circumstances the [retrospective] declaratory relief sought is barred by the [Eleventh] Amendment . . . because the issuance of such relief finding the Officers' actions unlawful would serve the same purpose as validating or

authorizing an award of monetary damages."  (Doc. # 98, at 11.)[10]  Additionally, the Officers assert that any request for declaratory relief is moot.  *See McKinnon v. Talladega Cnty., Ala.*, 745 F.2d 1360, 1363 (11th Cir. 1984) ("The general rule is that a prisoner's transfer or release from a jail moots his individual claim for declaratory and injunctive relief.").  Mr. King concedes that he is not entitled to this relief and offers no opposing arguments. (*See* Doc. # 102, at 2–3.)

Accordingly, Defendants are entitled to summary judgment on Mr. King's claims for declaratory relief because any retrospective declaratory or injunctive relief is barred by sovereign immunity, *see Summit*, 180 F.3d at 1336–37, and is moot, *see McKinnon*, 745 F.2d at 1363.

### 5.    *Scope of Count III*

Mr. King has abandoned any claim that Dr. Gurley was deliberately indifferent to his serious medical needs relating to head injuries incurred during the fight.   (*See* Doc. # 101, at 18 ("Plaintiff will not address double vision or headaches" in response to Dr. Gurley's motion for summary judgment because "Plaintiff's claim against Dr. Gurley is specifically for the delay in providing appropriate treatment for Plaintiff's fractured hand.").)    Consequently, the

---

[10] Pursuant to the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), "the Eleventh Amendment bars suits against state officials in federal court seeking retrospective or compensatory relief, but does not generally prohibit suits seeking only prospective injunctive or declaratory relief."  *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1336–37 (11th Cir. 1999).

discussion proceeds only with respect to the diagnosis and treatment of Mr. King's hand.

**B.**   **Mr. King's Claims Against the Officers**

Officers Anderson, Scarver, and Postell argue that they are entitled to qualified immunity on Counts I and II because they were not deliberately indifferent to Mr. King's safety, (Doc. # 98, at 12–23), and their actions did not violate clearly established law, (Doc. # 98, at 23).   The doctrine of qualified immunity protects government officials from individual liability for their discretionary actions that do not violate clearly established constitutional or statutory rights of which a reasonable person would have known.   *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).   There is no dispute that the Officers were acting in their discretionary authority.   To defeat the qualified immunity defense, Mr. King must show that the Officers violated his clearly established constitutional rights. *McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)).

**1.**   ***Deliberate Indifference to Substantial Risk of Serious Harm***

It is settled that "prison officials have a duty to protect prisoners from violence at the hands of other prisoners."   *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (alteration omitted).   Thus, a jail officer's deliberate indifference to a known, substantial risk of serious harm to an inmate in his custody violates the

Constitution.  *Goodman*, 718 F.3d at 1331.  "To survive summary judgment" on such a claim, a plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendant['s] deliberate indifference to that risk; and (3) causation."  *Id.* (internal quotation marks omitted).

As for the first element – a known, substantial risk – there must be "a strong likelihood, rather than a mere possibility [of harm to an inmate] before a guard's failure to act can constitute deliberate indifference."  *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal quotation marks omitted).  With respect to the second element – the defendant's deliberate indifference – the plaintiff must prove that the defendant was subjectively aware of the risk of serious harm and that he chose to disregard the risk by conduct that is more than gross negligence.  *Goodman*, 718 F.3d at 1332.  A defendant has not acted with deliberate indifference if (1) he "did not know of the underlying facts indicating a sufficiently substantial danger" and he was therefore unaware of danger, (2) he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent," or (3) he "responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer*, 511 U.S. at 844.

The Officers contest Mr. King's ability to show either a substantial risk of serious harm or deliberate indifference.  They do not believe that the presence of the broom in Cellblock 4-B created a substantial risk of serious harm to the

inmates and emphasize that brooms were entrusted to inmates for cleaning their cellblocks every day.  (*See, e.g.*, Doc. # 97-2 at ¶ 2.)  The Officers have testified that prior to the time that Mr. Gibson attacked Mr. King, they were unaware of another inmate ever using a broom as a weapon against another inmate.  (Docs. # 97-2, at ¶ 5; 97-3, at ¶ 3; 97-4, at ¶ 3.)

Hence, Officer Anderson explains that although he knew the inmates had the broom for the purpose of controlling the TV, he did not believe, based on his previous observations, that the broom's presence compromised any inmate's safety.  Similarly, Officer Postell says that he was aware that the inmates had the broom, but he had no reason to believe, based on his prior experience, that the presence of the broom posed a substantial risk of danger.  Unlike either Officer Anderson or Officer Postell, Officer Scarver claims that she believed the cleaning supplies had been put away, and she was therefore unaware of the underlying facts indicating any potential for danger.  (*See* Doc. # 97-4, at ¶ 3 ("I was under the impression that I had accounted for all cleaning supplies in 4-B cellblock earlier in the day.").)

Mr. King acknowledges the same legal standards for measuring deliberate indifference, but he proposes that a jury must decide whether the entrustment of the broom to the inmates created a substantial risk of serious harm and whether the Officers demonstrated deliberate indifference to that risk.  He suggests that a jury

could and likely would "infer [Defendants' subjective] knowledge from the obvious" danger of leaving inmates in control of a potential weapon.  (Doc. # 102, at 32.)

The Officers maintain that they had a custom of controlling the channel; Mr. King asserts that Officer Anderson violated official policy forbidding inmates to keep the broom in order to control the TV.  However, there is no dispute that, prior to the day Mr. King was injured by Mr. Gibson, the entrustment of cleaning supplies, including brooms, to inmates had not posed a threat to inmate safety.  Mr. King contends that brooms can be easily converted for abusive purposes, but he does not dispute that a broom is not ordinarily used as a weapon, and the broom's form was not altered to create something more dangerous.  There also appears to be no dispute that the specific inmates involved in this fight had no history of violence or threatening behavior with one another or other inmates.  Mr. King therefore fails to raise a genuine dispute of a substantial risk – that is, "a strong likelihood, rather than a mere possibility" – that an inmate could pose a threat of serious harm by wielding a broom handle as a weapon against another inmate. *Brown*, 894 F.2d at 1537.

Even if Mr. King could satisfy the first element of a deliberate indifference claim, he cannot show that the Officers had the requisite mental state to be held liable.  Neither Officer Anderson's entrustment of the broom to the inmates, nor

Officer Postell's failure to retrieve the broom after he saw the inmates use it to change the TV channel, nor Officer Scarver's failure to notice that a broom was missing from the cleaning supplies amounts to more than mere negligence.  *See Goodman*, 718 F.3d at 1332 (quoting *Brown*, 894 F.2d at 1537) ("Merely negligent failure to protect an inmate from attack does not justify liability under § 1983."); *see also Carter v. Galloway*, 352 F.3d 1346, 1350 (11th Cir. 2003) (reasoning that defendants' awareness of the plaintiff's cellmate's general propensity to cause trouble, without a more culpable, conscious disregard of a threat to the plaintiff's safety, did not rise above the level of ordinary negligence).  Mr. King cannot show that the Officers were consciously indifferent to Mr. King's safety by either acquiescing to the inmates' request to keep a broom for purposes of changing the TV channel, or negligently failing to account for a broom's whereabouts.  *See Goodman*, 718 F.3d at 1332.

In the absence of proof of a constitutional violation, Officers Anderson, Postell, and Scarver are entitled to qualified immunity on Count I.[11]

### 2.     *Deliberate Indifference – Failure to Protect or Intervene*

When an inmate attacks or abuses a plaintiff-inmate in an officer's presence, the officer may be liable for his failure or refusal to intervene.  *Terry v. Bailey*, 376 F. App'x 894, 896 (11th Cir. 2010) (citing *Ensley v. Soper*, 142 F.3d 1402, 1407

---

[11] The court will not assess the Officers' additional argument that even if one or all of them violated Mr. King's constitutional right, the right was not clearly established.

(11th Cir. 1998)).  "[I]n order for liability to attach, the officers must have been in a position to intervene." *Id.*  It is the plaintiff's burden to demonstrate that the defendant could have intervened. *Ledlow v. Givens*, 500 F. App'x 910, 914 (11th Cir. 2012) (citing *Hadley v. Gutierrez*, 526 F.3d 1324, 1330–31 (11th Cir. 2008)). "An officer who fails to intervene in a fight between inmates can only be held liable if he 'was physically able and had a realistic chance to intervene and act in time to protect the inmate Plaintiff.'" *Clary v. Hasty*, No. 7:12-CV-44 HL, 2013 WL 4008634, at *4 (M.D. Ga. Aug. 5, 2013) (quoting *Glispy v. Raymond*, No. 06–14269–CIV, 2009 WL 2762636 (S.D. Fla. Aug. 28, 2009)).

Officer Postell argues that he is entitled to summary judgment on Count II because he was not present in the control booth when Mr. Gibson attacked Mr. King.  Mr. King has offered no evidence to contradict Officer Postell's testimony that he was not in proximity to Mr. King when Mr. Gibson attacked.  Therefore, Mr. King cannot hold Officer Postell liable for failure to protect when he was not physically present to see the fight or to intervene to protect Mr. King.  *See Terry*, 376 F. App'x at 896.

Officer Scarver testifies that she was in another area of the dorm when she heard the commotion caused by the fight.  She then responded by reporting to the scene, calling a "Code Blue," and waiting for reinforcement before entering Cellblock 4-B.  She contends that she responded reasonably to the incident and in

accordance with her training to wait for back-up. (*See* Doc. # 98, at 18 (citing *Farmer*, 511 U.S. at 844; *MacKay v. Farnsworth*, 48 F.3d 491, 493 (10th Cir. 1995); *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).)

In *MacKay*, the Tenth Circuit found no deliberate indifference at summary judgment where the defendants "called for additional staff . . . and thus were preparing to intervene when sufficient staff was available in accordance with prison policy." 48 F.3d at 493. The *MacKay* court cited *Bell v. Wolfish* for its proposition that prison policies are accorded deference according to the need to preserve order and to maintain security. *Id.* (citing *Bell*, 441 U.S. at 547). Other district courts in this Circuit recently have relied on *MacKay* in determining that officers were not deliberately indifferent to inmates' safety by waiting for assistance. *See, e.g., Williams v. Simmons*, No. 5:11-CV-00378-MP-GRJ, 2014 WL 1664549, at *10 (N.D. Fla. Apr. 24, 2014); *Averhart v. Kendrick*, No. 2:11-CV-02567-VEH, 2014 WL 771126, at *4 (N.D. Ala. Feb. 25, 2014); *Sanford v. Toby*, No. CV 311-060, 2013 WL 4787143 at *8 (S.D. Ga. Sept. 6, 2013). *MacKay* is accepted as persuasive authority.

Mr. King offers no evidence that contradicts Officer Scarver's testimony that she required assistance before intervening. Further, he does not rebut the reasonableness of Officer Scarver's estimation that she could not intervene immediately without jeopardizing her own safety. Thus, Mr. King fails to meet his

burden of showing that Officer Scarver could have intervened sooner but failed to do so. *See Ledlow*, 500 F. App'x at 914.

Finally, Officer Anderson claims that he also responded appropriately by trying to defuse the inmates' argument, ordering the inmates to lock down when the fight began, immediately calling Code Blue over his radio, and remaining in the control booth in compliance with MCCF policy. Mr. King does not dispute the Officers' representation that Officer Scarver and others restored order less than two minutes after Mr. Gibson began attacking Mr. King. Officer Anderson's prompt response to the situation does not indicate deliberate indifference. Moreover, if Officer Anderson had abandoned the control booth, he could have created additional threats to security within MCCF. His decision to follow institutional policy is entitled to deference. *See MacKay*, 48 F.3d at 493 (citing *Bell*, 441 U.S. at 547).

Even if it had been permissible and prudent for Officer Anderson to leave the booth to intervene on behalf of Mr. King, Officer Anderson, like Officer Scarver, contends that Mr. King lacks evidence that a solo officer could have contained a fight involving three inmates without backup assistance. Again, Mr. King does not rebut this argument and thus cannot demonstrate Officer Anderson's deliberate indifference. *See Ledlow*, 500 F. App'x at 914.

Because Mr. King fails to demonstrate that Officer Anderson, Postell, or Scarver acted with deliberate indifference by failing to protect him from Mr. Gibson's attack, the Officers are entitled to qualified immunity on Count II.[12]

## C.   Mr. King's Claim Against Dr. Gurley

Mr. King makes clear in his brief that his claim for deliberate indifference to serious medical needs is only against Dr. Gurley.  (*See* Doc. # 101, at 1 n.1.) Accordingly, the Officers' defensive arguments, (*see* Doc. # 98, at 17–21), are disregarded, and the focus is on the briefing relating to Dr. Gurley's motion for summary judgment, (*see* Docs. # 99, 100).

### 1.   *Qualified Immunity*

Dr. Gurley asserts that he, like the Officers, is entitled to qualified immunity. (Doc. # 100, at 12.)  Mr. King responds that Dr. Gurley is not entitled to a qualified immunity defense.  In reliance upon the reasoning of *Richardson v. McKnight*, 521 U.S. 399 (1997), where the Supreme Court declined to extend qualified immunity to privately employed prison guards, the Eleventh Circuit has held that qualified immunity may not be extended to privately employed prison physicians.  *Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999), *opinion amended by* 205 F.3d 1264 (11th Cir. 2000).  Accordingly, Dr. Gurley cannot be entitled to summary

---

[12]   Because it is clear that Mr. King cannot prove that the Officers violated his constitutional rights, the court declines to consider the Officers' alternative argument that they did not violate clearly established law.

judgment on qualified immunity grounds.  The discussion proceeds to consider whether Dr. Gurley is otherwise entitled to summary judgment.

### 2.   *Deliberate Indifference to Serious Medical Needs*

"[D]eliberate indifference by prison personnel to an inmate's serious medical needs violates the inmate's right to be free from cruel and unusual punishment.  *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)).  To succeed on a deliberate indifference claim, the plaintiff must show (1) a serious medical need, (2) the defendant's deliberate indifference to the need, and (3) a causal connection between the defendant's indifference and the plaintiff's injury.  *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009).

### a.   **Serious Medical Need**

Serious medical needs are those which have been diagnosed by a doctor as mandating treatment, or those that are "so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Id.*  Alternatively, "a serious medical need is determined by whether a delay in treating the need worsens the condition."  *Id.*  Mr. King's fractured bone constituted a serious medical need, *see Lepper v. Nguyen*, 368 F. App'x 35, 39 (11th Cir. 2010) (finding that dislocation of two of inmate's finger joints constituted a serious medical need), and Dr. Gurley does not dispute this conclusion, but assumes its truth without

conceding the issue. Rather, Dr. Gurley contends that Mr. King has no evidence that he acted with deliberate indifference, or that there is a causal link to an actionable injury.

### b. Deliberate Indifference

Deliberate indifference is "defined as requiring two separate things: awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists and drawing of the inference." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (quoting *Farmer*, 511 U.S. at 837) (internal quotation marks and alterations omitted); *see also Goebert v. Lee Cnty.*, 510 F.3d 1312, 1327 (11th Cir. 2007) (requiring defendant's subjective awareness of a risk of serious harm, disregard of the risk, and conduct amounting to more than gross negligence). Thus, "mere medical malpractice" or "a simple difference in medical opinion" is insufficient to support a finding of deliberate indifference. *Waldrop*, 871 F.2d at 1033. But a doctor may be found liable for deliberate indifference if he decided "to take an easier and less efficacious course of treatment," if he failed "to respond to a known medical problem," or if he provided "grossly incompetent or inadequate care" that shocks the conscience. *Id.* "Deliberate delay" in providing care to a serious or painful injury also constitutes deliberate indifference. *Brown*, 894 F.2d at 1538. This is the sort of deliberate indifference of which Mr. King accuses Dr. Gurley. (*See* Doc. # 101, at 12–16.)

Dr. Gurley contends that he did not refuse to treat Mr. King and that Mr. King simply disagrees with Dr. Gurley's judgment and chosen method of treatment. In support of his position, he cites *Beard v. Banks*, 548 U.S. 521, 530 (2006) (plurality opinion), where the Supreme Court "distinguish[ed] between evidence of disputed facts and disputed matters of professional judgment." "In respect to the latter," courts "must accord deference to the views of prison authorities." *Id.* Dr. Gurley also relies on *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995), for its proposition that, in accordance with *Estelle*, a plaintiff's quarrel with whether a prison doctor "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment[,]' and therefore not an appropriate basis" for, liability. *Id.* (citing *Estelle*, 429 U.S. at 107).

In response, Mr. King maintains that Dr. Gurley demonstrated deliberate indifference by delaying adequate treatment for his bone fracture. (*See* Doc. # 101, at 13–14.) The parties dispute when Dr. Gurley learned of Mr. King's report of pain in his hand. Viewing the facts in the light most favorable to Mr. King, he complained about pain in his hand from the first time he saw Dr. Gurley on September 19, 2011. By that account, it took about two weeks for his fracture to be properly diagnosed (September 19 to October 2), and it took over two weeks before Mr. King saw an orthopedist (September 19 to October 5). When Mr. King

complained to Dr. Gurley about his hand during his examination, Dr. Gurley arguably should have appreciated that Mr. King's hand was not simply swollen but possibly broken or fractured.   But Mr. King has not shown how Dr. Gurley's delayed diagnosis amounts to more than negligence on the part of Dr. Gurley.   (*See* Doc. # 100, at 20 n.2.)

A delay in treatment is not more than negligence unless "'it [was] apparent that delay would detrimentally exacerbate the medical problem,' the delay [did] seriously exacerbate the medical problem, and the delay [was] medically unjustified." *Taylor*, 221 F.3d at 1259–60 (quoting *Hill v. Dekalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1187, 1187–89 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002)); *see also Goebert*, 510 F.3d at 1327.   Here, Mr. King offers only his allegations without any supporting medical evidence to suggest that a delayed diagnosis or delayed consultation with a specialist either exacerbated the fracture in his hand or caused the fracture to heal incorrectly.[13]  *See supra* n.9.

Hence, Mr. King cannot show that Dr. Gurley acted with deliberate indifference to Mr. King's serious medical needs.

---

[13] This conclusion is separate from but closely related to the court's conclusion regarding Dr. Gurley's argument that Mr. King fails to establish the causation element of a deliberate indifference claim.

### c.    Causation

Dr. Gurley asserts alternatively that any alleged delay in treating Mr. King's hand has not caused Mr. King to suffer the injury he alleges (*i.e*., a hand that has not properly healed).  Dr. Gurley asserts that Mr. King must support his claim with evidence, and Mr. King has no medical evidence that his hand did not heal.  To succeed on his claim, "an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Lepper v. Nguyen*, 368 F. App'x 35, 39–40 (11th Cir. 2010) (quoting *Townsend v. Jefferson Cnty.*, 582 F.3d 1252, 1259 (11th Cir. 2009)).  Mr. King relies on Dr. Mattox's note that he would have considered ORIF if he had seen Mr. King sooner, but Dr. Gurley, in reply, emphasizes that the reference to ORIF was just a suggestion, not a definite medical conclusion that Mr. King required ORIF in order for his hand to heal.  (Doc. # 104, at 4.)  Moreover, Dr. Mattox's note does not establish causation of the permanent injury Mr. King claims to have.

Further, Dr. Gurley asserts that even without ORIF, the medical record evidence demonstrates Mr. King's bone remained properly aligned and healed, as evidenced by his release from Dr. Mattox's before Mr. King was released from MCCF.  The court agrees with Dr. Gurley and finds that Mr. King fails to meet his

burden of showing that Dr. Gurley's deliberate indifference caused Mr. King to suffer a permanent physical injury to his hand.

However, Dr. Gurley fails to acknowledge Mr. King's allegation and testimony that he endured pain in his hand while he waited for treatment. Deliberately indifferent delay to a medical need that causes a plaintiff to endure pain is actionable, *see Brown*, 894 F.2d at 1537–38, and the court is aware of no requirement of medical evidence to support that subjective testimony of pain. Dr. Gurley argues that Mr. King offers "no causal link with *any* injury." (Doc. # 100, at 18 (emphasis added).) This is not true. Mr. King potentially can prove one kind of cognizable injury (*i.e.*, pain), but he lacks medical evidence to prove that he suffered or suffers another kind of injury – a hand that never properly healed. The court agrees with Dr. Gurley's argument on the causation prong of Mr. King's deliberate indifference to medical needs claim only with respect to Mr. King's alleged long-term injury to his hand.

Although Mr. King has evidence of his alleged injury of pain while he awaited medical treatment, his deliberate indifference to medical needs claim against Dr. Gurley still fails on the second element because Mr. King has not shown that Dr. Gurley acted with deliberate indifference. *See supra* Part IV.C.2.b.

### d.  Summary of Count III

Mr. King's constitutional claim against Dr. Gurley for deliberate indifference to serious medical needs fails because Mr. King cannot show that Dr. Gurley's treatment of his fractured metacarpal bone constituted more than negligence in timely diagnosing and seeking a specialist's treatment for the fracture. Accordingly, Dr. Gurley is entitled to summary judgment on Count III. Additionally, Mr. King fails to produce medical evidence affirming his allegation that Dr. Gurley's delay in diagnosing and treating the fracture temporarily or permanently exacerbated the extent of the injury.

## V.  CONCLUSION

Based on the foregoing analysis, it is ORDERED that Defendants' motions for summary judgment (Docs. # 96, 99) are GRANTED.

A separate final judgment will be entered.

DONE this 2nd day of June, 2014.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE